IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

THE UNITED STATES OF AMERICA,

     *Plaintiff*,

v.

MATTHEW BALLARD, District Attorney
for the Twelfth Prosecutorial District of
Oklahoma, in his official capacity,

     *Defendant*.

Case No. 4:24-cv-00626-SH

**THE UNITED STATES' MOTION FOR PRELIMINARY INJUNCTION AND
OPENING BRIEF IN SUPPORT**

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

BACKGROUND ....................................................................................................3

   I.     THE MUSCOGEE (CREEK) AND CHEROKEE RESERVATIONS .................3

   II.    DEFENDANT'S ASSERTIONS OF CRIMINAL JURISDICTION OVER INDIANS IN INDIAN COUNTRY .........................................................5

ARGUMENT .........................................................................................................6

   I.     LEGAL STANDARD.............................................................................6

   II.    A PRELIMINARY INJUNCTION SHOULD BE ISSUED ..................................7

        A.    The United States Is Likely To Succeed On The Merits ..............................7

             i.    Unless Congress expressly says otherwise, the United States and tribes, not states, possess criminal jurisdiction over Indians in Indian country. ................................................................7

             ii.   *Castro-Huerta* did not alter the rule that states lack criminal jurisdiction over Indians in Indian country absent congressional authorization. .................................................................8

             iii.  *McClanahan*, not *Bracker*, provides the framework for assessing state criminal jurisdiction over Indian defendants. ........................10

             iv.  Under the *McClanahan* framework, Oklahoma lacks criminal jurisdiction over Indians in Indian country..................................12

                  1.    Tribes possess inherent sovereignty to exercise criminal jurisdiction over all Indians in Indian country..................13

                  2.    The Muscogee (Creek) Nation's and Cherokee Nation's treaties preclude state criminal jurisdiction. .....................15

                  3.    Numerous federal statutes reflect preemption of Oklahoma's jurisdiction over Indians. ..............................16

                  4.    State criminal jurisdiction over Indian defendants would infringe on tribal self-government. ...................................20

        B.    The United States Will Suffer Irreparable Harm In The Absence Of A Preliminary Injunction, And Thus A Preliminary Injunction Is In The Public Interest. ................................................................................ 22

CONCLUSION......................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>

*Agostini v. Felton*,
  521 U.S. 203 (1997) ......................................................................................................9

*Bosse v. Oklahoma*,
  580 U.S. 1 (2016) ..........................................................................................................9

*Bryan v. Itasca Cnty.*,
  426 U.S.373 (1976) .............................................................................................1, 12, 18

*Cnty. of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation*,
  502 U.S. 251 (1992) .....................................................................................................21

*Ex parte Kan-gi- shun-ca (Crow Dog)*,
  109 U.S. 556 (1883) ..................................................................................................8, 17

*Denezpi v. United States*,
  596 U.S. 591 (2022) ................................................................................................13, 21

*Denver Homeless Out Loud v. Denver*,
  32 F.4th 1259 (10th Cir. 2022) .....................................................................................6

*Duro v. Reina*,
  495 U.S. 676 (1990) .....................................................................................................14

*Fisher v. Dist. Court*,
  424 U.S. 382 (1976) ................................................................................................21, 22

*Gordon v. Holder*,
  721 F.3d 638 (D.C. Cir. 2013) .....................................................................................25

*Haaland v. Brackeen*,
  599 U.S. 255 (2023) ...........................................................................................1, 7, 8, 24

*Hagen v. Utah*,
  510 U.S. 399 (1994) .....................................................................................................14

*Hogner v. Oklahoma*,
  500 P.3d 629 (Okla. Crim. App. 2021) .........................................................................5

*Indian Country, USA, Inc. v. Oklahoma*,
  829 F.2d 967 (10th Cir. 1987) .....................................................................................20

*McClanahan v. State Tax Comm'n*,
  411 U.S. 164 (1973) ............................................................................................. passim

*McGirt v. Oklahoma*,
  591 U.S. 894 (2020) ............................................................................................. passim

*Muscogee (Creek) Nation v. Pruitt*,
  669 F.3d 1159 (10th Cir. 2012) ...................................................................................12

*Nat'l Farmers Union Ins. Cos. v. Crow Tribe*,
  471 U.S. 845 (1985) .....................................................................................................23

*New Mexico v. Mescalero Apache Tribe*,
  462 U.S. 324 (1983) .........................................................................................11, 13, 19, 21

*Nken v. Holder*,
  556 U.S. 418 (2009) ..................................................................................................7, 22

*Oklahoma v. Castro-Huerta*,
  597 U.S. 629 (2022) ............................................................................................. passim

*Okla. Tax Comm'n v. Chickasaw Nation*,
  515 U.S. 450 (1995) .....................................................................................................12

*Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla.*,
  498 U.S. 505 (1991) ............................................................................................13
*Okla. Tax Com'n v. Sac & Fox Nation*,
  508 U.S. 114 (1993) ............................................................................................20
*Prairie Band of Potawatomi v. Pierce*,
  253 F.3d 1234 (10th Cir. 2001) .....................................................................23, 25
*Pursuing Am.'s Greatness v. FEC*,
  831 F.3d 500 (D.C. Cir. 2016) ........................................................................7, 22
*Ramah Navajo Sch. Bd., Inc. v. Bureau of Revenue of New Mexico*,
  458 U.S. 832 (1982) ............................................................................................19
*Rice v. Olson*,
  324 U.S. 786.........................................................................................................7
*Rice v. Rehner*,
  463 U.S. 713 (1983) ..................................................................................1, 10, 11
*Rodriguez v. Robbins*,
  715 F.3d 1127 (9th Cir. 2013)............................................................................25
*Rowe v. N.H. Motor Transp. Ass'n*,
  552 U.S. 364 (2008) ............................................................................................24
*SEC v. U.S. Realty & Improvement Co.*,
  310 U.S. 434 (1940) ............................................................................................24
*Seneca-Cayuga Tribe of Okla. v. Oklahoma*,
  874 F.2d 709 (10th Cir. 1989).......................................................................20, 23
*Spears v. Oklahoma*,
  485 P.3d 873 (Okla. Crim. App. 2021) ...............................................1, 4, 5, 15
*State v. Klindt*,
  782 P.2d 401 (Okla. Crim. App. 1989) .........................................................19, 20
*Tiger v. Western Inv. Co.*,
  221 U.S. 286 (1911) ............................................................................................20
*United States v. Antelope*,
  430 U.S. 641 (1977) ..............................................................................................8
*United States v. Kagama*,
  118 U.S. 375 (1886) ......................................................................................13, 17
*United States v. Lara*,
  541 U.S. 193 (2004) ......................................................................................14, 21
*United States v. Maloid*,
  71 F.4th 795 (10th Cir. 2023)...............................................................................9
*United States v. McBratney*,
  104 U.S. 621 (1881) ..............................................................................................9
*United States v. Ramsey*,
  271 U.S. 467 (1926) ............................................................................................20
*United States v. Wheeler*,
  435 U.S. 313 (1978) .........................................................................1, 8, 13, 21
*Ute Indian Tribe of the Uintah & Ouray Reservation v. Lawrence*,
  22 F.4th 892 (10th Cir. 2022)...........................................................................7, 8
*Ute Indian Tribe of the Uintah & Ouray Reservation v. Utah*,
  790 F.3d 1000 (10th Cir. 2015)..........................................................21, 22, 23, 25

iii

*Wagon v. Prairie Band Potawatomi Nation*,
  546 U.S. 95 (2005) ........................................................................................12
*Washington v. Confederated Bands & Tribes of Takima Indian Nation*,
  439 U.S. 463 (1979) ......................................................................................19
*White Mountain Apache Tribe v. Bracker*,
  448 U.S. 136 (1980) ............................................................................. passim
*Williams v. Lee*,
  358 U.S. 217 (1959) .................................................................................17, 19
*Winters v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ............................................................................................6
*Worcester v. Georgia*,
  31 U.S. (6 Pet.) 515 (1832) ............................................................................7
*Wyandotte Nation v. Sebelius*,
  443 F.3d 1247 (10th Cir. 2006) ................................................................22, 23

## Statutes

18 U.S.C. § 1151 ................................................................................................1, 3
18 U.S.C. § 1152 (General Crimes Act) ................................................................21
18 U.S.C. § 1153 (Major Crimes Act) .............................................................17, 21
25 U.S.C. § 1301 ........................................................................................14, 21, 22
25 U.S.C. § 1304 ....................................................................................................22
1968 Indian Civil Rights Act, Pub. L. No. 90-284, 82 Stat. 73 ............................18
Act of May 19, 1796, Ch. 30, 1 Stat. 469 ............................................................17
Act of Mar. 3, 1817, Ch. 92, 23 Stat. 383 ............................................................13
Act of June 30, 1834, Ch. 161, 4 Stat. 729 ..........................................................13
Act of June 25, 1948, Ch. 809, 62 Stat. 1224 (codified at 18 U.S.C. § 3243)............17
Act of June 30, 1948, Pub. L. No. 80-846, 62 Stat. 1161 .....................................18
Act of July 2, 1948, Ch. 809, 62 Stat. 1224 (codified at 25 U.S.C. § 232) ...........17
Oklahoma Enabling Act, Ch. 3335, 34 Stat. 267 (1906) ......................................20
Pub. L. 83-280 (1953), 67 Stat. 588 (codified 18 U.S.C. § 1162 and 28 U.S.C. § 1360) ............18

## Other Authorities

16 Cong. Rec. 934 (1885) .....................................................................................17
H.R. Rep. No. 102-261 (1991) ..............................................................................14
H.R. Rep. No. 101-938 (1990) (Conf. Rep.) .........................................................14
S. Rep. No. 83-699, 1953 U.S.C.C.A.N. 2409 (1953) .........................................18
Presidential Statement on Signing Bill Relating to State Jurisdiction over Cases Arising on
  Indian Reservations (Aug. 15, 1953) ...............................................................18
Treaty of Holston, July 2, 1791, 7 Stat. 39 ............................................................4
Treaty of New Echota, Dec. 29, 1835, 7 Stat. 478 ...........................................4, 16
Treaty with the Cherokee, Aug. 6, 1846, 9 Stat. 871 .......................................4, 16
Treaty with the Creeks, Mar. 24, 1832, 7 Stat. 366 ..........................................3, 15
Treaty with the Creeks, Feb. 14, 1833, 7 Stat. 418 ................................................3
Treaty with the Creeks, Aug. 7, 1856, 11 Stat. 699 ..........................................3, 15
Treaty with the Creeks, June 14, 1866, 14 Stat. 786 ..............................................3
Webster's New International Dictionary of the English Language (2d Ed. 1958) ........18

iv

## INTRODUCTION

Plaintiff United States of America moves for a preliminary injunction prohibiting Defendant Matthew Ballard, District Attorney for the Twelfth Prosecutorial District of Oklahoma, from asserting criminal jurisdiction over Indians in Indian country. Defendant's prosecutorial district includes Craig, Mayes, and Rogers Counties, which are within the exterior boundaries of both the Muscogee (Creek) and Cherokee Reservations. As affirmed by the Supreme Court, Congress never disestablished the Muscogee (Creek) Reservation, and therefore all land within the Reservation remains "Indian country" as defined by 18 U.S.C. § 1151(a). *McGirt v. Oklahoma*, 591 U.S. 894, 897 (2020). Likewise, applying *McGirt*, the Oklahoma Court of Criminal appeals affirmed that Congress never disestablished the Cherokee Reservation. *Spears v. Oklahoma*, 485 P.3d 873, 876-77 (Okla. Crim. App. 2021).

"State courts generally have no jurisdiction to try Indians for conduct committed in 'Indian country'" except as expressly authorized by Congress. *McGirt*, 591 U.S. at 898. This rule flows from both Congress's "plenary and exclusive" responsibility over Indian affairs, *see Haaland v. Brackeen*, 599 U.S. 255, 272-73 (2023), and Indian tribes' retained sovereignty and powers of self-government, including the power to punish Indian offenders within their territories, *United States v. Wheeler*, 435 U.S. 313, 323 (1978). These two principles generally combine to preempt the operation of state law over Indians in Indian country. *See, e.g., McClanahan v. State Tax Comm'n*, 411 U.S. 164, 171-72 (1973); *Brackeen*, 599 U.S. at 332 (Gorsuch, J., concurring). There is a "presumption of preemption" of state jurisdiction over Indians for on-reservation activities, *Rice v. Rehner*, 463 U.S. 713, 726 (1983), such that "[s]tate laws generally are not applicable to tribal Indians on an Indian reservation except where Congress has expressly provided that State laws shall apply," *Bryan v. Itasca Cnty.*, 426 U.S.

373, 376 n.2 (1976). As *McGirt* summarized and affirmed in the context of criminal jurisdiction, "this Court has 'long require[d] a clear expression of the intention of Congress' before the state or federal government may try Indians for conduct on their lands"—a standard that "Oklahoma cannot come close to satisfying." *McGirt*, 591 U.S. at 929.

Nevertheless, Defendant continues to prosecute Indians for conduct occurring in Indian country. Defendant has argued that, under *Oklahoma v. Castro-Huerta*, 597 U.S. 629 (2022) and *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136 (1980), Oklahoma enjoys concurrent criminal jurisdiction over Indians in Indian country. But *Castro-Huert*a did not alter the rule that, absent congressional authorization, states lack criminal jurisdiction over Indians in Indian country. In fact, *Castro-Huerta* repeatedly stressed that its opinion was confined to the facts before it: state criminal jurisdiction over *non-Indians*. 597 U.S. at 639 n.2 (state prosecutorial authority over Indians is "not before us"), 650 n.6 (expressing "no view on state jurisdiction" over crime committed by an Indian against a non-Indian in Indian country), n.9 ("To reiterate, we do not take a position on that question."). Federal law simply leaves no room for Oklahoma to prosecute Indians in Indian country absent congressional authorization, and *Castro-Huerta* did nothing to upend that bedrock principle.

The United States accordingly has a strong likelihood of success on the merits of this case. Further, Defendant's unlawful assertion of criminal jurisdiction over Indians in Indian country has irreparably harmed the United States, and the balance of equities and the public interest weigh heavily in favor of stopping Defendant's clear violations of federal law. Defendant's actions and incorrect interpretation of *Castro-Huerta* have created intolerable jurisdictional chaos in Indian country, and if allowed to stand would seriously impact the United

States' ability to protect tribal sovereignty and its own prosecutorial jurisdiction both in Oklahoma and nationwide. A preliminary injunction should therefore be issued.

## BACKGROUND

### I.    THE MUSCOGEE (CREEK) AND CHEROKEE RESERVATIONS

In a series of treaties during the 1800s between the United States and the Muscogee (Creek) Nation, the Muscogee (Creek) Reservation was established as a new and "permanent home to the whole Creek Nation" in what is now the State of Oklahoma. Treaty with the Creeks, preamble, Feb. 14, 1833, 7 Stat. 418; *see McGirt*, 591 U.S. at 897 ("In exchange for ceding 'all their land, East of the Mississippi river,' the U.S. government agreed by treaty that '[t]he Creek country west of the Mississippi shall be solemnly guarantied to the Creak Indians.'" (quoting Treaty with the Creeks, arts. I, XIV, Mar. 24, 1832, 7 Stat. 366, 368)). The United States promised the Muscogee (Creek) Nation that "[no] State or Territory [shall] ever have a right to pass laws for the government of such Indians, but they shall be allowed to govern themselves." 1832 Treaty, art. XIV, 7 Stat. 368. And the United States further promised the Muscogee (Creek) Nation that it would be "secured in the unrestricted right of self-government" with "full jurisdiction" over Indians within the Reservation. Treaty with the Creeks, art. XV, Aug. 7, 1856, 11 Stat. 699, 704; *see McGirt*, 591 U.S. at 902, 929. An 1866 treaty reduced the size of the Muscogee (Creek) Reservation but otherwise preserved it. Treaty with the Creeks, art. III, June 14, 1866, 14 Stat. 786.

In *McGirt*, the Supreme Court confirmed that Congress never disestablished the Muscogee (Creek) Reservation and, therefore, all land within the reservation remains "Indian country" as defined by 18 U.S.C. § 1151(a). 591 U.S. at 897. The Court noted that "in many treaties, like those now before us, the federal government promised Indian tribes the right to

continue to govern themselves." *Id.* at 929. As a result, the Court explained, "a clear expression of the intention of Congress" is required "before the state or federal government may try Indians for conduct on their lands." *Id.* Because "Oklahoma cannot come close to satisfying this standard," the Court held, the State lacked jurisdiction to prosecute McGirt, a member of the Seminole Tribe of Oklahoma, for committing a major crime within the Muscogee (Creek) Reservation. *Id.* at 929-30.

The United States made similar promises in treaties with the Cherokee Nation. In an early treaty, the United States authorized the Cherokee Nation to "punish . . . or not, as they please," "any citizen of the United States, or other person not being an Indian" who settled on tribal lands. Treaty of Holston, art. VIII, July 2, 1791, 7 Stat. 39. The United States later guaranteed that the Cherokee Nation's Reservation in what is now Oklahoma "shall, in no future time without their consent, be included within the territorial limits or jurisdiction of any State or Territory," and that the Cherokee Nation would have the right "to make and carry into effect all such laws as they may deem necessary for the government and protection of the persons and property within their own country belonging to their people or such persons as have connected themselves with them." Treaty of New Echota, art. 5, Dec. 29, 1835, 7 Stat. 478. The United States further promised the Cherokee Nation that "[n]o one shall be punished for any crime or misdemeanor except on conviction by a jury of his country, and the sentence of a court duly authorized by law to take cognizance of the offence." Treaty with the Cherokee, art. 2, Aug. 6, 1846, 9 Stat. 871; *see id.* arts. 1, 4 (referring to the Cherokee Reservation as "the country so exchanged" and "the country west of the Mississippi").

In *Spears*, the Oklahoma Court of Criminal Appeals applied the reasoning of *McGirt* to affirm that Congress had never disestablished the Cherokee Reservation. 485 P.3d 873, 876-77

(Okla. Crim. App. 2021); *see also Hogner v. Oklahoma*, 500 P.3d 629 (Okla. Crim. App. 2021) (State lacked jurisdiction to prosecute member of the Miami Tribe of Oklahoma for conduct occurring on the Cherokee Reservation). The court noted that the Cherokee Nation's treaties, which "were negotiated and finalized during the same period of time as" the Muscogee (Creek) Nation's treaties, "contained similar provisions that promised a permanent home that would be forever set apart, and assured a right to self-government on lands that would lie outside both the legal jurisdiction and geographic boundaries of any state." *Spears*, 485 P.3d at 876. As such, the court held, Oklahoma lacked criminal jurisdiction over Spears, a citizen of the Cherokee Nation, because the crime alleged occurred on the Cherokee Reservation. *Id.* at 877.

## II.   DEFENDANT'S ASSERTIONS OF CRIMINAL JURISDICTION OVER INDIANS IN INDIAN COUNTRY

Despite the longstanding rule that states do not have criminal jurisdiction to prosecute crimes committed by Indians in Indian country unless expressly authorized by Congress, and despite that precedent being recently affirmed by *McGirt*, Defendant has continued to prosecute Indians in Indian country. Defendant has brought at least three such criminal cases on behalf of the State: *Oklahoma v. Bull*, CF-2023-00226 (Dist. Ct. Rogers Cnty.) (criminal charges against an Indian for alleged conduct that occurred within the Cherokee Reservation); *Oklahoma v. Williams*, CF-2023-00311 (Dist. Ct. Rogers Cnty.); (same); *Oklahoma v. Ashley*, CF-2024-00421 (Dist. Ct. Rogers Cnty.) (same).

In *Bull*, for example, the District Court of Rogers County initially denied issuance of a warrant to arrest Mr. Bull because the State does not have jurisdiction to prosecute him. Defendant filed a petition for writ of mandamus with the Oklahoma Court of Criminal Appeals, seeking an order directing the district court to issue the warrant. In the petition, Defendant argued, based on *Castro-Huerta* and *Bracker*, that the State enjoys concurrent jurisdiction over

5

Indians in Indian country, in particular where an Indian commits a crime on a reservation other than their own. The Oklahoma Court of Criminal Appeals issued the writ, ordering the district court to issue the warrant but declining to address the jurisdictional question. Mr. Bull has been charged for the same conduct by both the United States in federal court and Cherokee Nation in tribal court. *See United States v. Bull*, 4:23-cr-00283 (N.D. Okla.); *Cherokee Nation v. Bull*, CF-2021-0002764 (Cherokee Nation Dist. Ct.).

Similarly, in *Williams*, the District Court of Rogers County determined that the State lacked jurisdiction to prosecute Mr. Williams and thus did not issue an arrest warrant. Defendant again sought a writ of mandamus from the Oklahoma Court of Criminal Appeals. The Oklahoma Court of Criminal Appeals, following its decision in *Bull*, ordered the district court to issue the arrest warrant while declining to address the jurisdictional question. On remand, Mr. Williams filed a motion to dismiss for lack of jurisdiction. The United States, as well as the Cherokee Nation and Chickasaw Nation, filed *amicus curiae* briefs supporting Mr. Williams's motion to dismiss, which is still pending. Mr. Williams has been charged for the same conduct by the Cherokee Nation in tribal court. *See Cherokee Nation v. Williams*, CF-2023-0002876 (Cherokee Nation Dist. Ct.).

## ARGUMENT

### I.    LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Denver Homeless Out Loud v. Denver*, 32 F.4th 1259, 1277 (10th Cir. 2022) (quoting *Winters v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Where the federal government seeks a

preliminary injunction, the second and fourth factors merge because "the government's interest is the public interest." *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016); *see also Nken v. Holde*r, 556 U.S. 418, 435 (2009).

## II.     A PRELIMINARY INJUNCTION SHOULD BE ISSUED

### A.     The United States Is Likely To Succeed On The Merits

Defendant's assertion of jurisdiction pursuant to *Castro-Huerta* and *Bracker* is foreclosed as a matter of federal law. States do not have criminal jurisdiction over Indians for conduct occurring in Indian country absent express authorization by Congress. *See, e.g.*, *McGirt*, 591 U.S. at 898, 929; *Ute Indian Tribe of the Uintah & Ouray Reservation v. Lawrence*, 22 F.4th 892, 900 (10th Cir. 2022) (absent congressional authorization, states lack jurisdiction over cases brought against a tribe or members involving conduct in Indian country). Because of the longstanding rule—reaffirmed by *McGirt* and unaltered by *Castro-Huerta*—that States do not have such jurisdiction unless authorized by Congress, the United States is likely to succeed on the merits of its sole claim in this case.

> i.     *Unless Congress expressly says otherwise, the United States and tribes, not states, possess criminal jurisdiction over Indians in Indian country.*

"The policy of leaving Indians free from state jurisdiction and control is deeply rooted in the Nation's history." *Rice v. Olson*, 324 U.S. 786, 789 (citing *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515 (1832); 1 Stat 469; 4 Stat. 729). This principle follows from several foundational principles of law. First, the U.S. Constitution assigns Congress "plenary and exclusive" responsibility over Indian affairs, including the regulation of relationships with Indian tribes and people. *See Brackeen*, 599 U.S. at 272-73 (collecting cases). This includes subjects, including criminal law, that in other contexts would be within the purview of the states—since the

7

founding of the country, Congress has enacted laws addressing criminal jurisdiction over crimes committed by Indians. *See* Section II.iv.3, *supra*.

Second, Indian tribes are sovereigns that retain powers of self-government except as withdrawn by Congress. *Wheeler*, 435 U.S. at 323. One power of self-government that tribes retain is "the sovereign power to punish tribal offenders as a continued exercise of retained tribal sovereignty." *Id.* at 324; *see also* Section II.iv.1, *supra*. In many treaties, including the Muscogee (Creek) and Cherokee treaties at issue here, *see* Section II.iv.2, the United States expressly promised Indian tribes "the right to continue to govern themselves" and exclusive jurisdiction over on-reservation Indians. *See McGirt*, 591 U.S. at 929.

These two principles generally combine to preempt the operation of state law over Indians in Indian country. *See, e.g., McClanahan,* 411 U.S. at 171-72; *Brackeen*, 599 U.S. at 332 (Gorsuch, J., concurring); *Ute Indian Tribe*, 22 F.4th at 900. Accordingly, "[s]tate courts generally have no jurisdiction to try Indians for conduct committed in Indian country." *McGirt*, 591 U.S. at 898; *see also, e.g.*, *United States v. Antelope*, 430 U.S. 641, 643 n.2 (1977) ("Except for the offenses enumerated in the Major Crimes Act, all crimes committed by enrolled Indians against other Indians within Indian country are subject to the jurisdiction of tribal courts"). "[A] clear expression of the intention of Congress" is required "before the state or federal government may try Indians for conduct on their lands." *McGirt*, 591 U.S. at 929 (quoting *Ex parte Kan-gi-shun-ca* (*Crow Dog*), 109 U.S. 556, 572 (1883)). This longstanding rule applies here.

        ii.      Castro-Huerta *did not alter the rule that states lack criminal jurisdiction over Indians in Indian country absent congressional authorization.*

Defendant has argued in state court criminal proceedings that, after *Castro-Huerta*, the *Bracker* balancing test must be applied to determine whether the State has criminal jurisdiction

over Indians for conduct that occurred in Indian country. Before *Castro-Huerta*, the law was clear that state criminal jurisdiction over Indians in Indian country is foreclosed absent an express authorization by Congress. *Castro-Huerta* did not alter that rule.

 *Castro-Huerta* considered only the "narrow jurisdictional issue" of "the State's exercise of jurisdiction over crimes committed by *non-Indians* against Indians in Indian country." 597 U.S. at 648, 653 (emphasis added). The Court's ruling was essentially an extension of its holding in *United States v. McBratney*, 104 U.S. 621 (1881), that states have jurisdiction over crimes committed exclusively between non-Indians in Indian country. The Court specifically and repeatedly disclaimed any intent to address state jurisdiction over Indians in Indian country. 597 U.S. at 639 n.2, 650 n.6 (question of state criminal jurisdiction over Indians in Indian country was "not before us," and "express[ing] no view on state jurisdiction over a criminal case of that kind"); *see also id.* at 693 (Gorsuch, J., dissenting) ("Most significantly, the Court leaves undisturbed the ancient rule that States cannot prosecute crimes by Native Americans on tribal lands without clear congressional authorization—for that would touch the heart of 'tribal self-government.'"). Instead, the Court stressed that its opinion was confined to the facts before it: state criminal jurisdiction over non-Indians. *Id.*

 Defendant's arguments regarding *Castro-Huerta* are not only wrong as a matter of law, they are also not cognizable in this Court. The Supreme Court has made clear that it has the "prerogative alone to overrule one of its precedents." *Bosse v. Oklahoma*, 580 U.S. 1, 3 (2016) (citation omitted); *Agostini v. Felton*, 521 U.S. 203, 237 (1997) (lower courts may not "conclude our more recent cases have, by implication, overruled an earlier precedent."); *see also United States v. Maloid*, 71 F.4th 795, 808 (10th Cir. 2023) (lower courts must "apply Supreme Court cases that directly control"). *Castro-Huerta* did not expressly overrule longstanding federal

9

precedent (only recently affirmed by *McGirt*) that states lack criminal jurisdiction over Indians for conduct that occurred in Indian country. In fact, as explained above, the Court expressly stated that it was not doing so. Accordingly, this Court must reject Defendant's arguments that *Castro-Huerta* implicitly overruled prior Supreme Court precedent governing state criminal jurisdiction over Indians for Indian country conduct.

> iii. McClanahan*, not* Bracker*, provides the framework for assessing state criminal jurisdiction over Indian defendants.*

In *Castro-Huerta*, the Supreme Court observed that a state may lack jurisdiction over crimes committed by Indians in Indian country not as a result of the preemptive effect of federal statute, but as a "result of a separate principle of federal law that . . . precludes state interference with tribal self-government." 597 U.S. at 639 n.2. The Court cited two exemplar cases for this principle—*Bracker* and *McClanahan*. But contrary to Defendant's assertion otherwise, *McClanahan*, not *Bracker*, provides the governing legal principles here.

Both *Bracker* and *McClanahan* address questions of state jurisdiction within Indian reservations. However, *McClanahan* sets forth the governing framework for state jurisdiction over Indians in Indian country, whereas *Bracker* applies to questions involving state jurisdiction over non-Indians. *McClanahan* and other cases establish a nearly universal rule against state jurisdiction over Indians for on-reservation activities absent congressional authorization. *McClanahan* involved Arizona's efforts to "impose its personal income tax on a reservation Indian whose entire income derives from reservation sources." 411 U.S. at 165. The Court recognized that "State laws generally are not applicable to tribal Indians on an Indian reservation except where Congress has expressly provided that State laws shall apply," *id.* at 170-71. In other words, states may exercise jurisdiction over Indians in Indian country only as authorized by Congress. *Id.* at 179-80; *Rice*, 463 U.S. at 719-20. Congress need not "explicitly pre-empt

assertion of state authority insofar as Indians on reservations are concerned." *Rice*, 463 U.S. at 719 (citing *Bracker*). Instead, there is a "presumption of preemption" of state law. *Id.* at 713, 726. Accordingly, in the context of criminal jurisdiction, the Court "has long require[d] a clear expression of the intention of Congress before the state or federal government may try Indians for conduct on their lands." *McGirt*, 591 U.S. at 929.

*Bracker*, on the other hand, addressed state authority to tax non-Indians operating solely on a reservation, and held that the taxes were pre-empted by federal law. 448 U.S. at 137-38. Where a state seeks to assert jurisdiction over non-Indians in Indian country, *Bracker* allows for a "particularized inquiry into the nature of the state, federal, and tribal interests at stake." 448 U.S. at 145; *Castro-Huerta*, 597 U.S. at 685 (citing *Bracker*). Under that particularized inquiry, known as the *Bracker* balancing test, "[s]tate jurisdiction is pre-empted by the operation of federal law if it interferes or is incompatible with federal and tribal interests reflected in federal law, unless the [S]tate interests at stake are sufficient to justify the assertion of [S]tate authority." *New Mexico v. Mescalero Apache Tribe,* 462 U.S. 324, 334 (1983) (citing *Bracker).* Accordingly, in *Castro-Huerta*, which involved state jurisdiction over a non-Indian in Indian country, the Court relied in part on *Bracker* for its analysis and conclusion that Oklahoma could assert criminal jurisdiction over non-Indians in Indian country. 597 U.S. at 650.

The Court has repeatedly distinguished between a state's assertion of jurisdiction over non-Indians and a state's assertion of jurisdiction over Indians, and it has endorsed different analytical frameworks for each. In *McClanhan*, the Court highlighted this distinction when it rejected the application of an "infringement on rights of reservation Indians" test because the analysis originated in cases that "dealt principally with situations involving non-Indians." 411 U.S. at 179. Because state jurisdiction over on-reservation Indians was at issue, the "problem

posed by this case is completely different." *Id.* at 179-80. *Bracker* itself recognized a clear demarcation between state jurisdiction over Indians and state jurisdiction over non-Indians: "[w]hen on-reservation conduct involving only Indians is at issue, state law is generally inapplicable." 448 U.S. at 144. The "[m]ore difficult questions arise where . . . a State asserts authority over the conduct of non-Indians engaging in activity on the reservation." *Id.*

Where a state seeks to exercise authority over on-reservation Indians, *Bracker* does not apply, and the Court has applied "a more categorical approach" exemplified by *McClanahan*. *See Okla. Tax Comm'n v. Chickasaw Nation*, 515, U.S. 450, 458 (1995); *Wagon v. Prairie Band Potawatomi Nation*, 546 U.S. 95, 99 (2005) ("the *Bracker* interest-balancing test applies only where 'a State asserts authority over the conduct of non-Indians engaging in activity on the reservation'" (quoting *Bracker*, 448 U.S. at 144)); *Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1172 (10th Cir. 2012) (no balancing required where Indian conduct is concerned). Accordingly, there is no need to conduct the "more difficult" *Bracker* balancing inquiry here. *McClanahan* provides the proper analytical framework.

        iv.      *Under the* McClanahan *framework, Oklahoma lacks criminal jurisdiction over Indians in Indian country.*

The general rule against state jurisdiction over Indians for on-reservation activities established by *McClanahan* and other cases applies with full force here. Under *McClanhan*, there is no balancing of state, federal, and tribal interests, and direct indicia of "infringement" on tribal self-government are not needed to bar state jurisdiction over on-reservation Indians. 411 U.S. at 179-80. Instead, *McClanahan* instructs that principles of inherent tribal sovereignty form a critical "backdrop" to consideration of "the applicable treaties and statutes which define the limits of state power." 411 U.S. at 172; *Bryan*, 426 U.S. at 376 n.2. That "backdrop" of inherent tribal sovereignty, along with the applicable treaties and statues discussed below, demonstrates

that Oklahoma lacks criminal jurisdiction over Indians in Indian country. In short, based on the

*McClanahan* framework, "a clear expression of the intention of Congress" is required before the

State "may try Indians for conduct on their lands"—a standard that "Oklahoma cannot come

close to satisfying." *McGirt*, 591 U.S. at 929-30.

> 1. <u>Tribes possess inherent sovereignty to exercise criminal
>    jurisdiction over all Indians in Indian country.</u>

Part of the "backdrop" of inherent tribal sovereignty against which the applicable treaties

and statutes must be considered is that tribes possess "inherent sovereign authority over their

members and territories." *Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla.,*

498 U.S. 505, 509 (1991); *see* Section II.A.i, *infra* (discussing principles of inherent tribal

sovereignty that form the critical "backdrop"). That inherent authority includes "the sovereign

power to punish tribal offenders as a continued exercise of retained tribal sovereignty." *Wheeler*,

435 U.S. at 324; *see also Denezpi v. United States*, 596 U.S. 591, 598 (2022). Tribal authority is

at its peak with respect to internal relations, and a "tribe's power to prescribe the conduct of

tribal members has never been doubted." *Mescalero Apache Tribe*, 462 U.S. at 332; *see also*

*McClanahan*, 411 U.S. at 171-72.

Moreover, federal law confirms that a tribe's inherent sovereign authority to exercise

criminal jurisdiction extends to *all Indians* in that tribe's Indian country. That is reflected in

historic statutes.[1] And it was reaffirmed by Congress in 1991 after the Supreme Court held that

---

[1] *See* Act of Mar. 3, 1817, Ch. 92, 23 Stat. 383 (expressly disclaiming federal jurisdiction over "any offense committed by one Indian against another" in Indian territory, without regard to tribal affiliation, on the understanding that tribes possessed such jurisdiction); Act of June 30, 1834, Ch. 161, sec. 25, 4 Stat. 729, 733 (continuing exception for "crimes committed by one Indian against the person or property of another Indian"); *United States v. Kagama*, 118 U.S. 375, 383 (1886) (term "Indian" in Major Crimes Act meant simply a member of some tribe, not necessarily of the tribe occupying the reservation where the crime occurred).

Indian tribes had been implicitly divested of their criminal jurisdiction over nonmember Indians. *See Duro v. Reina*, 495 U.S. 676 (1990).[2] Congress quickly reversed the Court by enacting the "*Duro* fix," which reaffirmed "the inherent power of Indian tribes . . . to exercise criminal jurisdiction over *all Indians*." 25 U.S.C. § 1301(2) (emphasis added); *see also United States v. Lara*, 541 U.S. 193, 199-200 (2004) (by passing *Duro* fix, Congress confirmed inherent tribal authority rather than delegating federal authority). Congress did so to fill the "jurisdictional void" created by *Duro*, which only existed because "states do not have jurisdiction to try Indians [including non-member Indians] for criminal offenses committed within Indian reservations except in those few instances in which Congress has conferred such authority upon them." H.R. REP. NO. 102-261 at 3-5 (1991); *see also* H.R. REP. NO. 101-938, at 104 (1990) (Conf. Rep.) ("[U]nless the Congress acts to fill this jurisdictional void, [non-member Indians] may come onto an Indian reservation, commit a criminal misdemeanor, and know that there is no governmental entity that has the jurisdiction to prosecute them for their criminal acts.").

In *Lara*, the Court upheld Congress's authority to enact the *Duro* fix, observing that the statute "involves no interference with the power or authority of any State," which demonstrates an understanding by the Court that states lacked criminal jurisdiction over non-member Indians. 541 U.S. at 204-05. The Court has demonstrated that same understanding in other cases. For example, in *Hagen v. Utah*, the Court assumed the State of Utah lacked jurisdiction to prosecute a member of the Little Shell Band of Chippewa Indians of Montana for a crime committed within the historical boundaries of the Ute Tribe's reservation "[b]ecause Congress has not

---

[2] The *Duro* Court acknowledged its holding may result in no sovereign possessing authority to prosecute a crime, though it noted that "Congress has provided a mechanism by which the States now without jurisdiction in Indian country may assume criminal jurisdiction through Pub. L. 280." 495 U.S. at 697.

granted criminal jurisdiction to the State of Utah to try crimes committed by Indians in Indian County." 510 U.S. 399, 408 (1994) (citations omitted); *see also* Brief for Petitioner at 4, *Hagen v. Utah* (No. 92-6281), 1993 WL 384821, at \*4 (noting defendant's tribal affiliation). More recently, in *McGirt*, the Court repeated the rule that states general lack criminal jurisdiction over Indians in Indian country—without distinguishing between member and non-member Indians—in determining that Oklahoma lacked jurisdiction to prosecute a member of the Seminole Nation for a crime committed on the Muscogee (Creek) Reservation. *McGirt*, 591 U.S. at 898, 929.

2.  The Muscogee (Creek) Nation's and Cherokee Nation's
treaties preclude state criminal jurisdiction.

The Muscogee (Creek) Nation and Cherokee Nation never surrendered their inherent sovereign authority to exercise criminal jurisdiction over Indians on their respective reservations. Rather, the relevant treaties demonstrate an understanding by both tribes, as well as the United States, that the tribes would possess sovereign authority over their lands, free from state criminal jurisdiction. *See McGirt*, 591 U.S. at 900-902, 929 ("in many treaties, like those now before us [between the United States and Muscogee (Creek) Nation], the federal government promised Indian tribes the right to continue to govern themselves"); *Spears*, 485 P.3d at 876-77 ("[t]he Cherokee treaties . . . assured a right to self-government on lands that would lie outside both the legal jurisdiction and geographic boundaries of any state").

The United States promised the Muscogee (Creek) Nation, for example, that "[no] State or Territory [shall] ever have a right to pass laws for the government of such Indians, but they shall be allowed to govern themselves," Treaty with the Creeks, Arts. I, XIV, Mar. 24, 1832, 7 Stat. 366, 368, and that the Nation would be "secured in the unrestricted right of self-government" with "full jurisdiction" over Indians within the Reservation, Treaty with the Creeks, etc., 1856, art. XV, Aug. 7, 1856, 11 Stat. 699, 704. The United States similarly guaranteed the

15

Cherokee Nation the right to "make and carry into effect all such laws as they deem necessary for the government and protection of the persons and property within their own country belonging to their people or such persons as have connected themselves with them," and that lands ceded "shall, in no future time without their consent, be included within the territorial limits or jurisdiction of any State or Territory." *See, e.g.*, Treaty of New Echota, art. 5, Dec. 29, 1835, 7 Stat. 478. In a later treaty, the United States further promised the Cherokee Nation that "[n]o one shall be punished for any crime or misdemeanor except on conviction by a jury of his country, and the sentence of a court duly authorized by law to take cognizance of the offence." Treaty with the Cherokee, art. 2, Aug. 6, 1846, 9 Stat. 871.

The treaty language for both the Muscogee (Creek) Nation and the Cherokee Nation is more explicit and forceful than that found sufficient to exclude state authority in *McClanahan*. There, although the Navajo treaty "nowhere explicitly states that the Navajos were to be free from state law," it nonetheless "was meant to establish the lands as within the exclusive sovereignty" of the tribe under general federal supervision. *McClanahan*, 411 U.S. at 174-75. Here, the United States' treaties with the Muscogee (Creek) Nation and Cherokee Nation were meant to do the same, while also more explicitly stating that the tribes would have an "unrestricted right of self-government" and "full jurisdiction" over Indians on their reservations.

3.    <u>Numerous federal statutes reflect preemption of<br>Oklahoma's jurisdiction over Indians.</u>

Consistent with the Muscogee (Creek) and Cherokee treaties, Congress has never expressly authorized the State of Oklahoma to exercise criminal jurisdiction over Indians in Indian country. Instead, Public Law 280 and similar statutes reflect Congress's understanding and intent that, absent congressional authorization, states lack criminal jurisdiction over Indians

16

in Indian country. *See, e.g.*, *Williams v. Lee*, 358 U.S. 217, 221 (1959) (where "Congress has wished" states to have such authority, "it has expressly granted them jurisdiction")

Congress's long-held understanding that states lack criminal jurisdiction over Indians in Indians country goes back to the Founding Era. In 1796, Congress passed the third Trade and Intercourse Act, which extended federal jurisdiction over Indians who committed crimes after crossing state or territorial lines. Act of May 19, 1796, Ch. 30, 1 Stat. 469, § 14. However, the Act applied only to crimes committed outside of tribal territory because tribes had exclusive authority to punish Indians within their territory. *Id.*[3]

Congress has since chosen to authorize certain states to prosecute Indians for crimes committed in Indian country or on specific reservations. *E.g.*, Act of July 2, 1948, Ch. 809, 62 Stat. 1224 (codified at 25 U.S.C. § 232) (New York); Act of June 25, 1948, Ch. 645, 62 Stat. 827 (codified at 18 U.S.C. § 3243) (Kansas). And in 1953, through Public Law 280, Congress exercised its plenary authority over Indian affairs to construct a comprehensive statutory scheme governing state assumption of criminal jurisdiction over Indians in Indian country. Congress passed Public Law 280 "to confer jurisdiction on California, Minnesota, Nebraska, Oregon, and Wisconsin" (and subsequently Alaska) "with respect to criminal offenses and civil causes of

---

[3] Congress chose to leave Indian country crimes involving only Indians to the sole jurisdiction of the tribes until the late 1880s. In *Crow Dog*, the Court held that tribes retained the exclusive right to make and enforce their own criminal laws, and thus federal courts lacked jurisdiction to prosecute the murder of a Sioux chief by another Sioux Indian. 109 U.S. at 557, 571-72. Only then did Congress extend federal jurisdiction to enumerated felonies committed by Indians in Indian country. Ch. 341, 23 Stat. 385 (1885) (codified at 18 U.S.C. § 1153). This statute, now known as the Major Crimes Act, was premised on Congress's understanding that only the tribe possessed authority to try crimes by Indians against Indians in Indian country. *See, e.g.*, 16 CONG. REC. 934 (1885) (Statement of Rep. Cutcheon, sponsor of Act) ("If . . . an Indian commits a crime against an Indian on an Indian reservation, there is now no law to punish the offense except . . . the law of the tribe . . . ."); *see also Kagama*, 118 U.S. at 383-84 (noting that states lack jurisdiction over Indians in Indian country because both the duty and power of their protection lies with the federal government).

17

action committed or arising on Indian reservations within such States." Pub. L. No. 83-280, 67 Stat. 588 (1953) (codified in part at 18 U.S.C. § 1162 and 28 U.S.C. § 1360). Public Law 280 also permitted other states "not having jurisdiction with respect to criminal offenses . . . to assume jurisdiction . . . ." *Id.* § 7. In the 1968 Indian Civil Rights Act, Congress amended Public Law 280 to require tribal consent before a state could assume "optional" jurisdiction. *See* Pub. L. No. 90-284, Tit. IV, 82 Stat. 73. The revised statute maintained the language confirming that states otherwise lacked such jurisdiction. *Id.* § 401. The 1968 amendments also provided a process by which states that had assumed jurisdiction under Public Law 280 could retrocede some or all that jurisdiction back to the federal government. *Id.* § 403(a).

Public Law 280 and its amendments, as well as earlier statutes, confirm Congress's understanding and intent that such jurisdiction exists only as expressly authorized by Congress.[4] After all, if states already possessed such jurisdiction, the only purpose of Public Law 280 would be to confirm existing jurisdiction. But the law "confer[s] jurisdiction" on states "not having jurisdiction," and "confer" means to "grant," "bestow," or "add"—all terms naturally read as providing something new to the recipient. *See* Webster's New International Dictionary of the English Language, at 559 (2d Ed. 1958); *see also* Act of June 30, 1948, Pub. L. No. 80-846, 62 Stat. 1161 ("An Act [t]o confer jurisdiction on the State of Iowa . . . .").

The Court has repeatedly affirmed that Public Law 280 provided states with jurisdiction over Indians that they otherwise lacked. For example, in *Bryan*, the Court recognized that the

---

[4] That intent is also confirmed by the legislative history of Public Law 280. *See* S. REP. NO. 83-699, at 5 (1953), as reprinted in 1953 U.S.C.C.A.N. 2409, 2411 ("[t]hese States lack jurisdiction to prosecute Indians for most offenses committed on Indian reservations or other Indian country, with limited exceptions."); *see also* Presidential Statement on Signing Bill Relating to State Jurisdiction over Cases Arising on Indian Reservations (Aug. 15, 1953) ( describing bill as "confer[ ring] jurisdiction" on the specified states and noting objections to provisions that would "permit other states to impose on Indian tribes . . . the criminal and civil jurisdiction of the state").

main purpose of the statute was to provide for state criminal jurisdiction because states otherwise "lack jurisdiction to prosecute Indians for most offenses committed on Indian reservations." 426 U.S. at 379) (citation omitted); *see also Washington v. Confederated Bands & Tribes of Takima Indian Nation*, 439 U.S. 463, 498-99 (1979) (observing that on reservations "whose tribes have not requested the coverage of state law, jurisdiction over crimes by Indians is, as it was when Pub. L. 280 was enacted, shared by the tribal and Federal Governments"); *Mescalero Apache Tribe*, 462 U.S. at 337 n.21; *Williams*, 358 U.S. at 221; *State v. Klindt*, 782 P.2d 401, 403 (Okla. Crim. App. 1989) (Public law 280 "provided the states permission to assume criminal jurisdiction" but if the statute's procedures were not followed, such jurisdiction does not exist). If states already possessed criminal jurisdiction over Indian defendants, it would make the statute's conferral of that jurisdiction superfluous. *See McClanahan*, 411 U.S. at 178 ("[W]e cannot believe that Congress would have required the consent of the Indians affected and the amendment of those state constitutions which prohibit the assumption of jurisdiction of the States were free to accomplish the same goal unilaterally by simple legislative enactment.").[5]

---

[5] In *Castro-Huerta*, the Court rejected the "surplusage" argument as to state jurisdiction over non-Indian defendants, but it did so in part by noting that Public Law 280 "also grants States jurisdiction over crimes committed *by Indians*." 597 U.S. at 648-49 (emphasis in original). The Court reasoned that its "resolution of the narrow jurisdictional issue in this case does not negate the significance of Public Law 280 in affording States broad criminal jurisdiction over other crimes committed in Indian country, such as crimes committed by Indians." *Id.* The Court thus recognized that Public Law 280 retains significance for crimes committed by Indians. Moreover, the Court's reasoning was based on the finding that Public Law 280 "contains no language that preempts States' civil or criminal jurisdiction" over non-Indians in Indian country, *id.*, but express preemptive language is not required to find that a state does not have jurisdiction over on-reservation Indians. *See McClanhan*, 411 U.S. at 174; *Ramah Navajo Sch. Bd., Inc.* v. *Bureau of Revenue of New Mexico,* 458 U.S. 832, 838 (1982). Nor is there any credible argument that the states as a general matter had, prior to Public Law 280, preexisting jurisdiction over Indians in Indian country that Congress was required to divest through particular statutory language.

While Congress has authorized states to assume criminal jurisdiction over Indians in Indian country through Public Law 280, Oklahoma has not taken the necessary steps to fit within that grant of authority. *See Okla. Tax Com'n v. Sac & Fox Nation*, 508 U.S. 114, 125 (1993) ("Oklahoma did not assume jurisdiction pursuant to Pub. L. 280" and thus lacks "either civil or criminal jurisdiction"); *Klindt*, 782 P .2d at 403 (same). And the United States, through Section 1 of the Oklahoma Enabling Act, ch. 3335, 34 Stat. 267 (1906), specifically preserved federal authority over Indian affairs within the State, retained tribal authority, and did not permit the State to assert jurisdiction over Indians. *United States v. Ramsey*, 271 U.S. 467, 469 (1926) (federal authority retained); *Tiger v. Western Inv. Co.*, 221 U.S. 286, 309 (1911) (same); *Indian Country, USA, Inc. v. Oklahoma*, 829 F.2d 967, 978-81 (10th Cir. 1987) (federal and tribal jurisdiction retained); *see also Seneca-Cayuga Tribe of Okla. v. Oklahoma*, 874 F.2d 709, 712 (10th Cir. 1989) ("Oklahoma, like many other states, was required to disclaim jurisdiction over Indians at statehood."). The Oklahoma Enabling Act makes clear that the State cannot exercise criminal jurisdiction over Indians in Indian country unless and until Congress authorizes it.

4.    State criminal jurisdiction over Indian defendants would infringe on tribal self-government.

State criminal jurisdiction over Indians in Indian country is also prohibited because it would "infringe[] on the right of reservation Indians to make their own laws and by ruled by them." *Bracker*, 448 U.S. at 142 (preemption and infringement analysis are independent barriers to state jurisdiction over Indians). Although *McClanahan* made clear that it is not necessary to establish infringement on tribal self-government where state jurisdiction over Indians is at issue, 411 U.S. at 171-72, 179-80, that independent barrier to state jurisdiction is also present here.

Tribal authority to define criminal offenses and punish Indian offenders within Indian country—in accordance with the tribe's own needs, cultural standards, and priorities—is a core

20

sovereign power. *E.g., Denezpi*, 596 U.S. at 598-99; *Lara*, 541 U.S. at 199-200; *Wheeler*, 435 U.S. at 324-25. And because a tribe's inherent power to exercise criminal jurisdiction over Indians in Indian country extends to member and non-member Indians alike, the exercise of state criminal jurisdiction over any Indian would directly infringe on tribal self-government. A state exercising criminal jurisdiction over any Indian in Indian country would effectively supplant a tribe's decisions on how to define and punish Indian offenders, directly interfering with what Congress has confirmed to be an inherent power of tribal self-government.[6] *See* 25 U.S.C. § 1301; *see also Ute Indian Tribe of the Uintah & Ouray Reservation v. Utah*, 790 F.3d 1000, 1006 (10th Cir. 2015) ("[T]here just no room to debate" that state prosecution of Indian defendant "create[s] the prospect of significant interference with [tribal] self-government." (citation omitted)); *cf. Mescalero Apache Tribe*, 462 U.S. at 338 (concurrent state jurisdiction over hunting and fishing by nonmembers would "effectively nullify" tribal authority and allow tribe to exercise authority "only at the sufferance of the State").

Moreover, state jurisdiction would subject Indians "to a forum other than the one they have established for themselves." *Fisher v. Dist. Court*, 424 U.S. 382, 387-88 (1976); *see also Cnty. of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation*, 502 U.S. 251, 265 (1992) (*in personam* jurisdiction over reservation Indians for tax purposes "would have been significantly disruptive of tribal self-government"). This "plainly would interfere with the

---

[6] For example, offenses that a tribe elects not to punish criminally could still be subject to state penalties, undermining the tribal decision regarding the criminal laws that govern their own communities. And such a regime would subject some Indian defendants to the risk of dual prosecutions, which in turn could undermine the choices made by the tribe with respect to which offenses should be punished and how. In the context of federal prosecutions, Congress expressed an intent in the General Crimes Act to avoid this potential conflict with tribal sovereignty by excluding from federal jurisdiction offenses by an Indian "who has been punished by the local law of the tribe." 18 U.S.C. § 1152; *see also* 18 U.S.C. § 1153 (authorizing federal jurisdiction over certain crimes committed by Indians in Indian country, exclusive of state jurisdiction).

powers of [tribal] self-government," *Fisher,* 424 U.S. at 387-88, even where nonmembers are

involved. *See* 25 U.S.C. § 1301(2) (tribal powers of self-government include criminal

jurisdiction over "all Indians"); 25 U.S.C. § 1304(b) (recognizing tribal power to exercise special

Tribal criminal jurisdiction over "all persons").

* * *

For all these reasons, Defendant's assertions of criminal jurisdiction over Indians in

Indian country is prohibited, and the United States has a strong likelihood of success on the

merits of its sole claim in this case.

> **B.     The United States Will Suffer Irreparable Harm In The Absence Of A Preliminary Injunction, And Thus A Preliminary Injunction Is In The Public Interest.**

When a case involves competing claims of jurisdiction, the Tenth Circuit has analyzed

the balance of harms and public interest factors together. *See Ute Indian Tribe,* 790 F.3d at 1007.

Moreover, when the federal government seeks a preliminary injunction, the second factor

(irreparable harm) and the fourth factor (the public interest) merge because "the government's

interest is the public interest." *Pursuing Am.'s Greatness*, 831 F.3d at 511; *see also Nken v.

Holde*r, 556 U.S. at 435. If Defendant is allowed to continue to unlawfully assert criminal

jurisdiction over Indians in Indian country, the United States will suffer irreparable harm both as

trustee for all federally recognized Indian tribes and as a prosecuting authority within Indian

country itself. Defendant, on the other hand, cannot assert any valid claim of injury by the

issuance of an injunction.

The Tenth Circuit has "repeatedly stated that . . .  an invasion of tribal sovereignty can

constitute irreparable injury." *Wyandotte Nation v. Sebelius*, 443 F.3d 1247, 1251-52, 1255 (10th

Cir. 2006) (upholding preliminary injunction preventing Kansas from enforcing state gaming

22

laws on a tract of tribal land because of the resulting infringement on tribal sovereignty). That injury is implicated here because the United States has a special relationship with Indian tribes, and has long been "committed to a policy of supporting tribal self-government and self-determination." *See Nat'l Farmers Union Ins. Cos. v. Crow Tribe,* 471 U.S. 845, 856 & n.20 (1985); *see also Ute Indian Tribe*, 790 F.3d at 1007 (noting the 'paramount federal policy' of ensuring that Indians do not suffer interference with their efforts to 'develop . . . strong self-government.'" (quoting *Seneca-Cayuga Tribe v. Oklahoma ex rel. Thompson*, 874 F.2d 709, 716 (10th Cir. 1989)).

In *Ute Indian Tribe*, for example, the Tenth Circuit explained that a state prosecuting Indians for traffic offenses in Indian country is "itself an infringement on tribal sovereignty," and that "the harm to tribal sovereignty in this case is perhaps as serious as any to come our way in a long time." 790 F.3d at 1005. Similarly, in *Prairie Band of Potawatomi v. Pierce*, the Tenth Circuit found that Kansas's enforcement of state vehicle licensing and registration provisions against Indians in Indian country constituted irreparable injury to tribal sovereignty. 253 F.3d 1234, 1250-51 (10th Cir. 2001). The court explained that the "threat of continued citation by the state created the prospect of significant interference with [tribal] self-government.'" *Id.* Here, Defendant continues to prosecute Indians for conduct occurring in Indian country in violation of federal law. Under these circumstances, "there's just no room to debate whether the defendants' conduct 'create[s] the prospect of significant interference with [tribal] self-government that this court has found sufficient to constitute 'irreparable injury.'" *Ute Indian Tribe*, 790 F.3d at 1006 (brackets in original) (quoting *Prairie Band*, 253 F.3d at 1250-51); *see also Wyandotte Nation*, 443 F.3d at 1251-52, 1255.

23

Defendant's assertion of criminal jurisdiction over Indians in Indian country also encroaches on the United States' own authority in Indian country, including on the Muscogee (Creek) and Cherokee Reservations. As discussed above, Congress has "plenary and exclusive" responsibility over Indian affairs, which includes the regulation of relationships with Indian tribes and people. *See Brackeen*, 599 U.S. at 272-73. The states, on the other hand, do not and cannot enjoy that responsibility under the structure of the U.S. Constitution. Defendant's assertion of criminal jurisdiction over Indians in Indian country usurps that federal responsibility, as well as the United States' prosecutorial authority in Indian country, which Congress has carefully crafted over decades through statutes like the Major Crimes Act and Public Law 280. *Cf. McGirt*, 591 U.S. at 903 (if a state had the authority to reduce a federal reservation, it could "encroach on the tribal boundaries or legal rights Congress provided, and, with enough time and patience, nullify the promises made in the name of the United States"); *SEC v. U.S. Realty & Improvement Co.*, 310 U.S. 434, 460 (1940) (recognizing the federal government's "interest in the maintenance of its statutory authority and the performance of its public duties").

These injuries to the United States are compounded by the fact that, if Defendant's actions are allowed to stand, other states could be similarly emboldened to assert criminal jurisdiction over Indians in Indian country in violation of federal law. *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 373 (2008) (allowing a state to set a requirement that conflicts with federal law "would allow other States to do the same"). This could create a patchwork system of laws, and have a serious impact on the United States' ability to protect tribal sovereignty and its own prosecutorial jurisdiction in other states in addition to Oklahoma.

In contrast to the irreparable harm that the United States will suffer absent a preliminary injunction, Oklahoma has no legitimate interest in its assertion of criminal jurisdiction over

Indians in Indian country in violation of federal law. Oklahoma "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins,* 715 F.3d 1127, 1145 (9th Cir. 2013). And "enforcement of an unconstitutional law is always contrary to the public interest." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013). In any event, Defendant would not be harmed by a preliminary injunction here. Defendant is free to transfer criminal cases to the proper jurisdiction—tribal or federal. *See Ute Indian Tribe*, 790 F.3d at 1007 (argument that "an injunction would impede their ability to ensure safety on public rights-of-way . . . 'is not as portentous as [state and county] would have it'" because nothing in the requested preliminary injunction would stop them "from referring suspected offenses by Indians to tribal law enforcement" and would instead "simply prohibit" what "they have no legal entitlement to do in the first place" (quoting *Prairie Band*, 253 F.3d at 1253)). There is no question that the balance of the harms weighs heavily in favor of issuing a preliminary injunction.

## CONCLUSION

For the reasons explained above, the United States respectfully requests that the Court grant this motion and preliminarily enjoin Defendant from continuing to assert criminal jurisdiction over and prosecuting Indians for conduct occurring in Indian country.

DATED:  December 23, 2024        Respectfully submitted,

                              TODD KIM, Assistant Attorney General
                              Environment & Natural Resources Division

                              */s/ Cody McBride*
                              CODY MCBRIDE
                              HILLARY HOFFMAN
                              United States Department of Justice
                              Environment & Natural Resources Division
                              Indian Resources Section
                              P.O. Box 7611, Ben Franklin Station
                              Washington, D.C. 20044
                              Tel.: (202) 514-6755 (McBride)
                              Tel.: (202) 598-3147 (Hoffman)
                              Fax: (202) 353-1156
                              cody.mcbride@usdoj.gov
                              hillary.hoffman@usdoj.gov

OF COUNSEL:
CONOR CLEARY, Field Solicitor, Tulsa Field Solicitor's Office
United States Department of the Interior
Office of the Solicitor

                              *Attorneys for United States of America*